STATE of Wisconsin, Plaintiff-Respondent,

v.

Jennifer E. FRANCIS, Defendant-Appellant.†

Court of Appeals

*No. 2004AP1360–CR. Submitted on briefs April 14, 2005.
—Decided June 15, 2005.*

2005 WI App 161

(Also reported in 701 N.W.2d 632.)

† Petition to review denied 8-25-05.

452

On behalf of the defendant-appellant, the cause was submitted on the brief of *Hans P. Koesser* of *Koesser Law Offices, S.C.* of Kenosha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Sally L. Wellman*, assistant attorney general.

Before Brown, Nettesheim and Snyder, JJ.

¶ 1. BROWN, J. Jennifer E. Francis appeals from a judgment of conviction and an order denying her motion for postconviction relief. The basis for the conviction arose out of an attempt to commit "suicide by cop" by taking hostages at a Kenosha tavern. Francis initially entered joined pleas of not guilty and not guilty by reason of mental disease or defect, i.e., insanity. She later accepted a plea bargain in which she pled guilty to several counts and no contest to another. Francis offers a host of reasons why we should permit her to withdraw these subsequent pleas, but the only argument we deem to be of any arguable merit is her contention that the circuit court erred when it accepted her pleas of guilty and no contest without conducting a personal colloquy to ensure that she waived her NGI plea knowingly, voluntarily, and intelligently. We reject this argument. Courts engage in personal colloquies in order to protect defendants against violations of their fundamental constitutional rights. Neither the federal constitution nor our state constitution confers a right to an insanity defense or plea. The court therefore had no obligation to personally address Francis with respect to the withdrawal of her NGI plea.

¶ 2. On July 14, 2001, Francis, after drinking heavily, obtained a gun from a recent boyfriend's apartment, intending to commit suicide. Fearing she would

not succeed in killing herself, she entered Rickie's Greyhound Tavern, intending to cause an altercation that would induce police officers to fatally shoot her. After several more drinks, she started an argument by removing batteries from a patron's cell phone and a tavern phone and refusing to return them. Francis pulled the pistol out of her purse and began brandishing it at other guests and employees, threatening to kill them. She also locked the doors of the tavern and demanded that the other patrons hand over their cell phones and batteries.

¶ 3. One man eventually managed to strike Francis from behind with a pool cue. He and several other patrons wrestled her to the ground, overpowered her, and wrested the gun away. They summoned the police.

¶ 4. Within the next thirteen days, the State committed Francis pursuant to WIS. STAT. ch. 51 (2003–04).[1] She spent two weeks at St. Luke's Hospital and then was discharged to the Kenosha County Jail.

¶ 5. The circuit court bound Francis over for trial at the conclusion of an August 7 preliminary hearing. The State filed a twenty-four-count information. These counts included one count of disorderly conduct using a dangerous weapon, ten counts of intentionally aiming and pointing a firearm at a person, ten counts of first-degree recklessly endangering safety with a dangerous weapon, two counts of attempted armed robbery, and one count of battery.

¶ 6. At the arraignment on September 14, Francis entered pleas of not guilty and not guilty by reason of mental disease or defect. The court also ordered a mental examination of Francis. The order asked the

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

examining doctor to explore Francis' mental responsibility at the time of the July 14 incident.

¶ 7. A November 21 hearing addressed certain of Francis' mental health issues. Francis had been moved to the county jail by this time, and counsel complained that the jail doctor had taken her off of the medicine her personal doctor had prescribed and expressed concern that the jail staff's practice of isolating her when she expressed suicidal urges or feelings of depression was not adequately addressing her treatment needs. Francis' counsel also acknowledged receipt of the examiner's report and requested an opportunity to review and discuss it with Francis before deciding whether to request another evaluation.

¶ 8. The report concluded that Francis had difficulties resulting from depression, alcohol dependence and intoxication, and possibly another disorder at the time she committed the offenses. The report also concluded, however, that these disorders did not impair her psychological functioning to such a degree as to diminish her mental responsibility for her acts. The examiner opined that Francis did not lack capacity either to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law. He stated, "It is my opinion that her psychopathology did not relate to the alleged crime in a manner that would satisfy a special plea."

¶ 9. Although not specifically asked by the court to address Francis' current mental status or competency to proceed, the examining doctor also made several observations relevant to that issue. He first observed:

> At the beginning of my interview, I explained the purpose of the evaluation to Ms. Francis. I described the issue of exculpatory insanity, a bifurcated trial

process, where information obtained from her would be sent, and what may happen to her depending upon the court's adjudication of this issue. She said that she understood those comments and, in fact, she had no evident difficulty understanding them. She said that she had spoken to her attorney about the evaluation and my comments were consistent with her expectations.

The examiner also remarked that Francis was "alert, responsive and cooperative with all aspects of the interview procedures" and "was quite conversational and, thus, an easy source of relevant information." Finally, the report noted, "Throughout the interview, her expressed thoughts were consistently relevant and coherent. No delusional ideation was elicited."

¶ 10. The case had been scheduled for a jury trial on January 28, 2002. However, the State offered Francis a plea bargain. In return for a plea of no contest to one count of attempted armed robbery and a plea of guilty to six of the first-degree reckless endangerment charges, the State would reduce those offenses from first-degree to second-degree reckless endangerment. It would also reduce the remaining four reckless endangerment charges from first to second degree. They were to be read in for sentencing purposes and dismissed. The second count of attempted armed robbery was also to be dismissed and read in. Moreover, the State would dismiss outright the remaining counts, which comprised the disorderly conduct, battery, and the ten aiming and pointing a firearm counts.

¶ 11. Counsel discussed the advantages and disadvantages of a plea bargain versus a trial and encouraged Francis to accept the State's offer. This deal reduced Francis' prison-time exposure by several decades. Moreover, counsel believed the doctor's report

revealed a lack of support for a viable NGI defense. Francis accepted the deal and entered her new pleas of no contest and guilty on January 28.

¶ 12. On March 12, 2004, Francis filed her motion for postconviction relief. She alleged several grounds on which the circuit court should permit her to withdraw her subsequent pleas. These included the following: (1) the circuit court erred when it accepted her pleas of guilty and no contest without ascertaining via a personal colloquy that Francis intended to abandon her earlier NGI plea; (2) trial counsel rendered ineffective assistance by not requesting a competency evaluation; (3) her pleas were not knowingly, intelligently, and voluntarily entered because trial counsel coerced her to enter them; (4) her pleas were not knowing, intelligent, and voluntary because neither the court nor trial counsel properly explained to her the essential elements of each charge; and (5) Francis should be allowed to withdraw her pleas because she asked trial counsel to do so but he refused and told her she had relinquished all of her rights.

¶ 13. The circuit court held a postconviction hearing on April 29. The court denied her motion in all respects. Francis appeals on all grounds.

■

¶ 14. We will address the NGI argument first, given that this is the lone issue with arguable merit. Whether the courts must engage defendants in a personal colloquy before allowing them to abandon an NGI plea requires us to determine the applicable legal rules. This task presents a question of law. *See Steven V. v. Kelley H.*, 2003 WI App 110, ¶ 29, 263 Wis. 2d 241, 663 N.W.2d 817 (determining what legal rules to apply involves a question of law), *aff'd on other grounds*, 2004 WI 47, 271 Wis. 2d 1, 678 N.W.2d 856. We have not

encountered this precise issue in Wisconsin before, but we find three lines of cases helpful in resolving this issue of first impression.

¶ 15. The first line of cases addresses the rationale behind personal colloquies; these cases recognize the important role such colloquies play in protecting fundamental constitutional rights. The United States Supreme Court has recognized the importance of personal colloquies since at least 1969 when it decided *Boykin v. Alabama*, 395 U.S. 238 (1969). In *Boykin*, the Court reversed the defendant's conviction because the record did not affirmatively demonstrate that he voluntarily and intelligently entered his pleas of guilty in five cases of robbery. *Id.* at 240, 242, 244. The Court observed, "So far as the record shows, the judge asked no questions of petitioner concerning his plea, and petitioner did not address the court." *Id.* at 239. Later in the opinion, it proclaimed:

> What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he [or she] has a full understanding of what the plea connotes and of its consequence. When the judge discharges that function, he [or she] leaves a record adequate for any review that may be later sought.

*Id.* at 243–44. *See also id.* at 247–48 (Harlan, J., dissenting) (lamenting that the majority was effectively holding "that the prophylactic procedures of [Rule 11 of the Federal Rules of Criminal Procedure] are substantially applicable to the States as a matter of federal constitutional due process" and observing that Rule 11 required "explicit inquiry into whether [the plea] was knowingly and understandingly made"). The Court obviously intended to mandate on-the-record colloquies.

459

¶ 16. In stating the rationale for the colloquy requirement, the Court observed that a guilty plea involves the waiver of several important constitutional rights. "First, is the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment . . . . Second, is the right to trial by jury. Third, is the right to confront one's accusers. We cannot presume a waiver of these three important federal rights from a silent record." *Boykin*, 395 U.S. at 243 (citations omitted). It further explained, "Ignorance, incomprehension, coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of unconstitutionality." *Id.* at 242–43. The Court stated that due process requires an intentional relinquishment or abandonment of the three constitutional rights in order to be valid. *Id.* at 243 & n.5.

¶ 17. Where Wisconsin courts have required on-the-record personal colloquies as a prerequisite for waiving certain rights, they also have cited the fundamental character of the particular constitutional rights at stake. In *State v. Weed*, 2003 WI 85, ¶ 2, 263 Wis. 2d 434, 666 N.W.2d 485, our supreme court concluded that a defendant's right to testify in his or her own defense constituted a fundamental constitutional right that required the protection of an on-the-record colloquy to ensure a valid waiver. Similarly, in *State v. Anderson*, 2002 WI 7, ¶ 23, 249 Wis. 2d 586, 638 N.W.2d 301, the court concluded that "without a personal colloquy, we are unable to determine that Anderson's jury trial waiver is knowing, intelligent, and voluntary. The right to a jury trial is a fundamental right." (Footnote omitted.)

¶ 18. We single out these fundamental rights for special protection because they are deeply embedded in our constitutional fabric and "fundamental to the con-

cept of fair and impartial decision making." *See N.E. v. DHSS*, 122 Wis. 2d 198, 205, 361 N.W.2d 693 (1985) (citation omitted). In *N.E.*, our supreme court averred:

> In considering the issue of waiver of rights, "[t]his court and other courts have characterized certain rights as fundamental and have held that the law takes particular pains to ensure that the decision to waive those rights is that of the defendant." Fundamental rights are those very basic constitutional rights which are " '. . . fundamental to the concept of fair and impartial decision making." The trial court has a "serious and weighty responsibility" to determine on the record, "whether there is an intelligent and competent waiver by the accused" when a defendant attempts to waive fundamental rights.

*Id.* at 205–06 (citations omitted); *see also Weed*, 263 Wis. 2d 434, ¶ 37 (noting that our courts did not mandate the special protection of a personal on-the-record colloquy for waivers of the right to testify until the United States Supreme Court in *Rock v. Arkansas*, 483 U.S. 44 (1987), deemed it a fundamental right).[2]

¶ 19. The second line of cases makes abundantly clear that the right to an NGI plea simply does not qualify as a fundamental constitutional right. As we have already commented, Wisconsin has not dealt with this issue before, but we will not ignore the weight of authority from other jurisdictions. Florida, Idaho, and Montana have specifically rejected the notion that any federal constitutional right to an NGI plea exists. *See Parkin v. State*, 238 So. 2d 817, 822 (Fla. 1970); *State v. Korell*, 690 P.2d 992, 999 (Mont. 1984); *State v. Searcy*,

---

[2] We note that although *Boykin v. Alabama*, 395 U.S. 238 (1969), never specifically mentioned the impartiality consideration, the three rights the Court singled out as important clearly had this character.

798 P.2d 914, 916 (Idaho 1990). *Korell* reasoned in part, "The United States Supreme Court has never held that there is a constitutional right to plea an insanity defense." *Korell*, 690 P.2d at 999.

¶ 20. Nevada struck down a statute abolishing NGI pleas in *Finger v. State*, 27 P.3d 66 (Nev. 2001), but even that decision is not particularly helpful to Francis. *Finger* essentially equated insanity with a lack of mens rea and held that the latter requires that the defendant appreciates the wrongfulness of his or her conduct. *Id.* at 82–84. Thus, it held that where mens rea constitutes an element of the crime, insanity must be a complete defense. *Id.* at 84. In doing so, however, it made clear that the states had no obligation to adopt any particular procedural protections.

> While we conclude that neither the United States nor the Nevada Constitutions require that legal insanity be procedurally raised as an affirmative defense or by way of a plea of "not guilty by reason of insanity," both Constitutions prohibit an individual from being convicted of a criminal offense without possessing the requisite criminal intent to commit the crime.

*Id.* at 68. The court struck down the abolition of NGI pleas *not* because it concluded NGI pleas were constitutionally required but because it deemed the provision eliminating them to be inextricably intertwined with other provisions aimed at the utter abolition of insanity as an excuse for a crime. *Id.* at 84.[3]

[3] Moreover, four states, namely, Montana, Idaho, Kansas, and Utah, have legislatively abolished the very basis of an NGI plea, namely insanity as an affirmative defense. *See State v. Bethel*, 66 P.3d 840, 844–45 (Kan. 2003), *cert. denied*, 540 U.S. 1006 (2003); *State v. Korell*, 690 P.2d 992, 996–97 (Mont. 1984); *State v. Herrera*, 895 P.2d 359, 361 (Utah 1995); *State v. Searcy*,

¶ 21. We also do not deem an NGI plea a constitutional right based on our state constitution. The source of a defendant's right to plead NGI appears to be purely statutory. *See* WIS. STAT. § 971.06. Francis cites no constitutional protection under which the right to an insanity plea would fall. Moreover, we note the following language in *N.E.*:

> In contrast to those rights which are so fundamental that waiver must be done personally are rights which may be waived by a lawyer on a defendant's behalf. The decisions not to cross-examine witnesses, not to challenge evidence, and *not to present evidence* are generally viewed as tactical decisions which may be made by the lawyer.

*N.E.*, 122 Wis. 2d at 206 (citations and footnote omitted; emphasis added). A defendant who withdraws an NGI plea essentially chooses to forgo an NGI defense. Deciding not to present a particular defense is basically a choice "not to present evidence" in support of that defense. Thus, an NGI plea appears to fall into the category of rights that are not fundamental.

¶ 22. Taken together, these first two sets of cases suffice to dispose of Francis' contention that the court

---

798 P.2d 914, 915, 917 (Idaho 1990). Instead, these states allow evidence of mental disease or defect solely for the purpose of rebutting the mens rea element of a crime. *See Korell*, 690 P.2d at 996–1000; *Searcy*, 798 P.2d at 915, 917–18; *Bethel*, 66 P.3d at 841, 844–45; *Herrera*, 895 P.2d at 361–64. The supreme courts of all four states have upheld those statutes against constitutional challenges. *See generally Bethel*, 66 P.3d 840; *Korell*, 690 P.2d 992; *Herrera*, 895 P.2d 359; *Searcy*, 798 P.2d 914. The court in *Searcy* declared, "[I]t is the prerogative of the legislature to decide (1) whether [an insanity] defense is available, and (2) what form such a defense will take." *Searcy*, 798 P.2d at 916 n.2.

was required to conduct an on-the-record colloquy with respect to her desire to abandon her NGI plea. They make clear that only fundamental constitutional rights warrant this special protection and that an NGI plea falls outside the realm of fundamental rights. Nevertheless, a third group of cases bolsters our conclusion that Francis was not entitled to a personal colloquy. These cases have specifically considered when a court must personally address a defendant to ensure a knowing, voluntary, and understanding waiver of an NGI plea.

¶ 23. The following summary distills what, from these cases, we ascertain to be the prevailing rules. First, defendants can withdraw their NGI pleas through counsel rather than personally. In deciding whether to withdraw a plea of NGI, counsel has no right to act contrary to the defendant's expressed wishes, as the decision ultimately belongs to the defendant. *See People v. Blye*, 43 Cal. Rptr. 231, 234–35 (Ct. App. 1965); *State v. Tenace*, 700 N.E.2d 899, 906 (Ohio Ct. App. 1997); *State v. Byrge*, 225 Wis. 2d 702, 727, 594 N.W.2d 388 (Ct. App. 1999), *aff'd*, 2000 WI 101, 237 Wis. 2d 197, 614 N.W.2d 477. In the absence of an objection, however, counsel acts on the defendant's behalf when counsel withdraws the defendant's NGI plea and may exercise professional discretion in choosing whether or not to do so. *See People v. Gaines*, 375 P.2d 296, 298–99 (Cal. 1962), *overruled on other grounds by People v. Morse*, 388 P.2d 33 (Cal. 1964); *Blye*, 43 Cal. Rptr. at 233–34; *see also Tenace*, 700 N.E.2d at 904–06, 908 (reversing judgment of conviction because defendant objected on the record); *People v. Baker*, 58 Cal. Rptr. 691, 694 (Ct. App. 1967) (objection must be affirmative; the defendant cannot idly stand by and later claim that counsel acted improperly).

¶ 24. In accepting counsel's withdrawal of an NGI plea, the circuit court need not personally address the defendant to ascertain his or her assent. *See generally Baker*, 58 Cal. Rptr. 691 (no colloquy occurred). In *People v. Bloom*, 774 P.2d 698, 709 (Cal. 1989), the California Supreme Court stated:

> [N]o recitals of constitutional rights need be given "where there is no doubt of a defendant's sanity in the mind of the trial court and the reports of the examining psychiatrists unanimously indicate that such defendant was sane at the time of the offense. Free withdrawal of the insanity plea under such circumstances should be permitted as it has been in the past."

(Citations omitted); *see also People v. Guerra*, 708 P.2d 1252, 1255–56 (Cal. 1985); *People v. Redmond*, 94 Cal. Rptr. 543, 548–49 (Ct. App. 1971).

¶ 25. Moreover, some courts even recognize implicit withdrawals of NGI pleas, i.e., *nobody,* including defense counsel, formally withdraws the plea. The Ohio courts have held that a validly entered guilty plea automatically waives any insanity defense because such a plea amounts to an implied admission of sanity and has the same effect as an adjudication of guilt following a trial. *State v. McQueeney*, 774 N.E.2d 1228, 1232–33 (Ohio Ct. App. 2002); *State v. Fore*, 248 N.E.2d 633, 636–37 (Ohio Ct. App. 1969).

> "A plea of guilty by one who is competent, and has a full understanding and appreciation of the consequences of entering the plea, precludes any defense whatever to the crime." By pleading guilty, the accused acknowledges full responsibility for all legal consequences of guilt and consents to whatever judgment and sentence the court may legally impose.
>
> A valid guilty plea entered by a defendant is an

465

> "implied admission of sanity." Thus, when a defendant enters a plea of not guilty by reason of insanity, and then later enters a plea of guilty without formally withdrawing the not guilty by reason of insanity plea, the defendant has waived any argument pertaining to the insanity defense.

*McQueeney*, 774 N.E.2d at 1232–33 (citations omitted); *see also Fore*, 248 N.E.2d 636–37 (cited in *McQueeney*). Obviously when the courts recognize implicit withdrawals of pleas, no express colloquy has occurred in which the defendant affirmatively professes his or her desire to abandon an NGI defense.

¶ 26. Based also on this third set of cases, Francis had no right to insist on a personal colloquy as a prerequisite to a valid plea withdrawal. First, because her subsequent plea of guilty is fundamentally inconsistent with an NGI defense, she implicitly withdrew the NGI plea by her own act. So long as the latter plea was not otherwise deficient—and we explain below why it was not—she has no valid complaint.[4]

¶ 27. Second, at the time Francis entered her subsequent pleas, the court had no reason to doubt her sanity either at that time or when she committed the offenses. The only doctor's report available clearly opined that she did *not* lack the mental capacity to commit the crimes charged and, moreover, demon-

---

[4] At the postconviction hearing, the circuit court specifically noted that when it accepted Francis' subsequent pleas, it inquired whether she understood she was waiving *any defenses* she might otherwise have. The record supports this observation. The circuit court opined that "any defenses" included NGI. We agree that the circuit court had no obligation to single out any specific defenses, particularly the NGI, which Francis obviously contemplated.

strated a rational comprehension of the proceedings at the time of the evaluation. This observation is consistent with counsel's testimony and the court's own observations. Counsel testified at the postconviction hearing that although he had concerns that county personnel were not adequately treating Francis' depression, he never had any reason to doubt that she understood the proceedings. She appeared upset at the beginning of their interviews, but "[o]nce she was calmed down she seemed very rational." Moreover, at the time the court accepted the guilty and no contest pleas, Francis answered affirmatively in response to the court's inquiries as to whether she understood the various rights she was giving up.[5]

¶ 28. We now briefly address Francis' various other contentions. First, Francis complains that her counsel performed ineffectively when he failed to request a competency evaluation. The circuit court found that there was no reason to doubt Francis' competency. We will not upset the circuit court's factual findings in the absence of clear error. *State v. Benoit*, 229 Wis. 2d 630, 641, 600 N.W.2d 193 (Ct. App. 1999). When the evidence of record supports more than one plausible inference, the fact finder does not clearly err when it chooses between them, and we must accept the court's

---

[5] While we hold that a personal colloquy is not required to withdraw an NGI plea, we believe it is nonetheless advisable for trial courts to engage in personal colloquy for at least two reasons: First, it helps satisfy the court that the defendant is aware and alert as to what is going on. Second, the record is protected from later ineffective assistance of counsel claims where a convicted defendant might assert that counsel never discussed the NGI withdrawal.

467

inference even if we would have made a different choice. *State v. Poellinger*, 153 Wis. 2d 493, 506–07, 451 N.W.2d 752 (1990).

¶ 29. The circuit court relied on credible evidence when it determined that competency was not an issue. It accepted the examiner's opinion that Francis understood the proceedings, the charges, and who the relevant parties were. It also accepted counsel's testimony that he never doubted her competency. We do not find this evidence so incredible that a reasonable fact finder could not rely on it. *See id.* (trier of fact not to rely on evidence that is incredible as a matter of law).

¶ 30. Francis next contends that counsel coerced her into the plea and that it was not voluntary, knowing, and understanding. Again, the court implicitly rejected Francis' testimony. It found instead that she made a tactical decision on the advice of counsel to plead based on her lack of a viable defense to a majority of the charges and the fact that the plea agreement reduced her sentencing exposure. Credible evidence, such as the examiner's report and counsel's testimony about Francis' reduced exposure, amply supports this inference. We discern no clear error.

¶ 31. Francis' fourth and fifth contentions focus on her alleged lack of understanding of the charges against her. She claims that she did not understand the nature of the reckless endangerment and attempted armed robbery charges because neither counsel nor the court discussed all of the essential elements with her. The law requires the circuit court to personally address the defendant to ascertain that he or she understood the nature of the offenses charged. Wis. Stat. § 971.08; *State v. Bangert*, 131 Wis. 2d 246, 255, 266–72, 389

N.W.2d 12 (1986). The court must satisfy itself that the defendant grasps the essential elements of the crimes. *Bangert*, 131 Wis. 2d at 267–68; *State v. McKee*, 212 Wis. 2d 488, 491–93, 569 N.W.2d 93 (Ct. App. 1997). Even if the defendant makes a prima facie showing that the plea hearing was deficient, however, our law does not mandate withdrawal of the plea so long as the State offers clear and convincing evidence at the postconviction hearing that the defendant did in fact enter his or her pleas knowingly, voluntarily, and intelligently. *See Bangert*, 131 Wis. 2d at 274–76 (majority), 298–99 (Heffernan, C.J., concurring) (noting, "The majority would allow for a *post hoc* cure of a deficient plea hearing by admitting evidence at the postconviction hearing.").

¶ 32. We determine that even if Francis could show some deficiency in the plea proceedings, the combination of the plea colloquy, the plea questionnaire, and other evidence at the postconviction proceeding demonstrates that Francis voluntarily, knowingly, and intelligently entered her pleas. We first address the attempted armed robbery charge. Counsel testified that he discussed the intent element with Francis three or four times and that she professed her innocence to that crime because her intent was to commit suicide. Francis could not possibly have thought that her intention to commit "suicide by cop" prevented a finding of guilt unless she *did* understand that intent to steal required intent to permanently deprive the individuals who owned the cell phones and batteries of their property. The court accepted that counsel explained the elements of the offense to Francis. In doing so, it obviously deemed counsel's representation that he did discuss this element with Francis more credible than Francis' assertion to the contrary.

¶ 33. The record also contains credible evidence to support Francis' knowledge of the other elements. Francis claims she did not understand the following elements: (1) intent to take and carry away a cell phone; (2) from the presence of the owner; (3) without the owner's consent; and (4) using force or threat of imminent force. The plea form indicates that she threatened to use deadly force with a firearm in order to preclude her victim's resistance to the theft. The latter three elements are implicit in this description. Moreover, during the plea colloquy, in which the court cited the specific conduct to which this description applied, the court specifically characterized the use of force as imminent. Finally, immediately before Francis entered her plea and the court conducted the personal colloquy, the court described the allegations in the attempted armed robbery count. The court's description indicated that the defendant attempted to take property from the victim's presence, had the intent to steal, used a threat of imminent force, and that she did so to compel the victim's acquiescence to the taking and carrying away of property, thus touching upon all elements of the crime.

¶ 34. Francis also claims she did not know the elements of a reckless endangerment offense. Counsel testified that he explained to her what it meant to be reckless and that he was certain he "went over what the crime consisted of and compared that to her conduct." We do not deem counsel's testimony inherently unreliable, such that a reasonable court could not accept it as true.

¶ 35. Finally, Francis asserts that although she asked counsel to withdraw her plea prior to sentencing, he refused to do so. Counsel testified that he did not recall Francis ever asking him to do so. The circuit court reasonably inferred that counsel lacked a recol-

lection of this request because Francis had never made it. Again, Francis simply wants to retry factual issues on appeal.

¶ 36. We affirm the denial of postconviction relief. The majority of Francis' contentions simply lack merit. We also reject her argument that the court had an obligation to personally address her with respect to the abandonment of her NGI plea before accepting changed pleas of guilty and no contest. We do not require personal colloquies where no fundamental constitutional right is at stake. An NGI plea simply does not rise to that level.

*By the Court.*—Judgment and order affirmed.